**FILED**

NOV 0 2 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                    ]   Case No. 07-52890-ASW
                                          ]
THE BILLING RESOURCE, dba                 ]   Chapter 11
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                    Debtor.              ]
_____]
THE BILLING RESOURCE, dba                 ]   Adversary No. 07-5156
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                    Plaintiff,           ]
vs.                                       ]
                                          ]
FEDERAL TRADE COMMISSION, et al.,         ]
                                          ]
                    Defendants.          ]
_____]

MEMORANDUM DECISION RE ORDER TO SHOW CAUSE
REGARDING PRELIMINARY INJUNCTION

Before the Court is an Order to Show Cause ("OSC") why a
preliminary injunction should not issue enjoining the Federal Trade
Commission ("FTC") and David R. Chase ("Receiver"), not
individually, but solely in his capacity as receiver for Access One
Communications, Inc. ("Access One") and Network One Services, Inc.
("Network One")[1] from taking actions against The Billing Resource,

_____

[1] In addition to these two entities, Receiver is also the receiver for several other entities in
(continued...)

dba Integretel ("Integretel" or "Debtor")[2] in the action captioned
Federal Trade Commission v. Nationwide Connections, Inc., et al.,
Case No. 06-80180-Civ-Ryskamp ("Florida Action") pending in the
United States District Court for the Southern District of Florida
("Florida Court"). Debtor seeks to enjoin the FTC from prosecuting
the enforcement aspect of the Florida Action ("Enforcement Action")
against Debtor (and not against the other defendants in that
action) as well as enjoining the Receiver from implementing or
enforcing the Omnibus Order entered in the Florida Action on
September 14, 2007 ("Omnibus Order") (as it relates solely to
Debtor, and not to any other defendants). Debtor also seeks to
unblock $1,762,762.56 currently held by Debtor in a blocked account
("Blocked Account"). These funds were taken from Debtor's general
commingled funds and placed temporarily in the Blocked Account
pursuant to a stipulation between Debtor and Receiver -- at the
suggestion of the Court -- entered into at the September 26, 2007
hearing on Debtor's interim motion for use of cash collateral.

A hearing on the OSC was held on October 17, 2007 and the
matter has been submitted for decision. Debtor is represented by
Michael H. Ahrens, Esq. and Steven B. Sacks, Esq. of Sheppard,
Mullin, Richter & Hampton, LLP. FTC is represented by Michael P.
Mora, Esq. and Collot Guerard, Esq. Receiver is represented by
Walter K. Oetzell, Esq. of Danning, Gill, Diamond & Kollitz, LLP
and Jeffrey C. Schneider, Esq. of Tew Cardenas LLP. The Official

---

[1](...continued)
the litigation brought by FTC in which Receiver was appointed. The only two receivership entities
that are relevant to these proceedings are Access One and Network One.

[2] This Court will use Integretel to differentiate actions taken by or events related to Debtor
that occurred pre-petition.

1  Committee of Unsecured Creditors ("Committee") is represented by

2  John D. Fiero, Esq. of Pachulski Stang Ziehl & Jones LLP. Creditor

3  POL, Inc. is represented by Kathryn S. Diemer, Esq. of Diemer,

4  Whitman & Cardosi, LLP. Creditor PaymentOne Corporation

5  ("PaymentOne") is represented by Stephen H. Warren, Esq. of

6  O'Melveny & Myers LLP. Creditor United Online, Inc. is represented

7  by Jeffrey K. Garfinkle, Esq. of Buchalter Nemer. BSG Billing

8  Solutions is represented by James A. Pardo, Jr., Esq. and Felton E.

9  Parrish, Esq. of King & Spalding LLP.

10  This Memorandum Decision constitutes the Court's findings of

11  fact and conclusions of law, pursuant to Rule 7052 of the Federal

12  Rules of Bankruptcy Procedure.

13

14  I.

15  FACTS

16  **A.  Debtor's Business**[3]

17  Debtor provides billing-related and other services for smaller

18  private telecommunications companies that compete with large local

19  exchange carriers ("LECs") in niche areas such as public pay

20  phones, hotels and prisons ("Alternative Operator Services").

21  Private telecommunications companies that provide Alternative

22  Operator Services have difficulty billing for "collect" and other

23  types of calls, since most individuals do not pay invoices from

24  these unknown companies and those companies cannot bill the

25  individuals through the individual's normal telephone bill. Debtor

26

27

---

28  [3] While "Debtor" refers to the post-petition business entity and "Integretel" refers to the pre-petition business entity, the Court uses Debtor in the following section rather than Integretel because the section describes Debtor's business both pre- and post-petition.

was created in 1988 to address this void in the marketplace.
Debtor has billing and collection agreements with an estimated
1,400 LECs -- both major local exchange companies and numerous
independents.  Debtor's infrastructure permits private
telecommunications providers to incorporate such providers' charges
into the phone bills of more than 90% of business and residential
consumers throughout the United States and Canada.

The typical service contract between Debtor and its service
provider customers provides that the customer submits to Debtor the
customer's billing transaction in a data format acceptable to
Debtor.  In the typical service contract, the customers acknowledge
that these billing transactions are structured as a purchase of
accounts receivable.  Debtor contends that its customers have no
ownership interest in the proceeds of the billing transaction after
the billing transactions are submitted to Debtor and its customers
hold only an unsecured claim against the distributions payable by
Debtor to the customer under the service contracts -- usually in 90
or so days.  The service contracts provide detailed formulas for
computing the amounts Debtor owes to its customers.  Debtor
maintains certain reserves for disputes, fees and other adjustments
as bookkeeping entries only.

The service contracts provide that each week Debtor transfer
by wire to its customers' bank accounts the net proceeds identified
in the prior week as defined by the service contracts.  This amount
is forwarded approximately 90 days after the submission of the
billing transaction.  Once Debtor receives a billing transaction,
Debtor submits the billing information to the LECs and the LECs in
turn bill the end user.  At varying intervals, the LECs make

MEMORANDUM DECISION RE
ORDER SHOW CAUSE

1  payments into Debtor's "wire in" account based on the billing
2  transactions previously submitted to the LEC.  Funds are
3  transferred into this account every day throughout the day.

4      Once a week -- typically on a Thursday -- Debtor settles its
5  accounts with its customers.  To settle accounts, Debtor disburses
6  funds from the "wire in" account to the "wire out" account.  The
7  "wire out" account is a zero balance account meaning that all funds
8  transferred into that account are generally transferred out to
9  several other accounts on the same day.  It is from these other
10 accounts that Debtor: (1) pays its vendors, employees and other
11 operating expenses; (2) collects taxes that Debtor is required to
12 collect in connection with Debtor's business; (3) makes payments to
13 LEC end users that are entitled to a cash voucher for a refund;[4]
14 and (4) holds excess funds, if any, from weekly settlements to
15 cover subsequent operating shortfalls including settlement
16 obligations that exceed available funds in the "wire in" account.

17     Debtor has approximately thirty-seven employees.  In 2000,
18 Debtor formed PaymentOne as a subsidiary to address the specialized
19 billing and support requirements of the internet.  Debtor owns 97%
20 of PaymentOne.  In 2002, Debtor formed another majority-owned
21 subsidiary known as Inmate Calling Solutions, LLC to target the
22 correctional industry and in 2004, Debtor formed yet another
23 majority-owned subsidiary known as Information Services 900 LLC to
24 target 900 call traffic.

---

26    [4] Certain individual or business consumers are occasionally entitled to a refund or a credit.
27 This results, inter alia, from an error in billing.  Debtor asserts that 95% of these cases are corrected
electronically through an automated credit transaction.  In the 5% of errors handled through the
28 issuance of a voucher to the consumer, the voucher -- redeemable for cash -- is drawn from the
voucher account.

MEMORANDUM DECISION RE

**B. Florida Action**

On February 27, 2006, the FTC commenced the Florida Action in the Florida Court against three Alternative Operator Services providers as well as their principals (not Integretel or its principals) for alleged deceptive and unfair practices for unauthorized billing of charges on phone bills in violation of the Federal Trade Commission Act. The FTC alleged that these defendants had defrauded consumers throughout the United States of more than $30 million by placing unauthorized collect call charges onto consumers' telephone bills. At the request of the FTC, the Florida Court entered an *ex parte* temporary restraining order ("TRO") that shut down the defendants' alleged unlawful operation, froze the defendants' personal and corporate assets and appointed Receiver as temporary receiver for the corporate defendants. Two of the corporate defendants -- Access One and Network One -- were prior customers of Integretel (collectively, "Prior Customers"). On March 8, 2006, a preliminary injunction was entered ("Preliminary Injunction") and Receiver was permanently appointed.

Both the TRO and the Preliminary Injunction provided, <u>inter alia</u>, that any business entity served with a copy of the TRO or Preliminary Injunction

> that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset at any time since the date of entry of this Order, shall:
>
> A.  Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset except by further order of the Court;
>
> .  .  .

TRO at page 8; Preliminary Injunction at page 9. The FTC asserts that the FTC served Integretel with the TRO within days of the entry of the TRO.

On March 6, 2006, Integretel's president, Ken Dawson, submitted a letter to the FTC stating in relevant part that: (a) Integretel had service contracts with the Prior Customers; (b) pursuant to the service contract with the respective Prior Customer, each Prior Customer was entitled to certain proceeds from billing transactions; however (c) each Prior Customer was in default under the service contract and no amounts were currently due and owing. Mr. Dawson noted that Integretel had not processed any billing for Access One since May 2005 nor for Network One since June 2003. With respect to each Prior Customer, Mr. Dawson stated: "[t]o the extent proceeds become due to [Prior Customer] in the future, we will establish a separate bank account into which such funds will be deposited and notify your office accordingly."[5] Pre-petition Integretel did not establish any such separate bank account.

On September 21, 2006, the FTC filed an amended complaint asserting claims against Integretel for Integretel's collection of alleged fraudulent charges. Specifically, the complaint asserts that Integretel deceptively billed consumers for collect calls that were never made, received or authorized. In its complaint, the FTC seeks a monetary judgment as well as multiple forms of non-monetary relief such as a permanent injunction against pertinent law

---

[5] Letter dated March 6, 2006 from Ken Dawson to Roberto Menjivar, Attachment B to Declaration of Laura Kim in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction filed on October 1, 2007.

MEMORANDUM DECISION RE

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

violations, "fencing-in" injunctive relief, rescission of contracts and a claims procedure for consumer redress. Integretel filed an answer denying the FTC's allegations. Integretel's principals were not named in the amended complaint.

On October 16, 2006, Receiver filed a motion in the Florida Court seeking to hold Integretel in contempt of court for Integretel's alleged failure to turn over to the Receiver on behalf of the Prior Customers certain "reserves" under the service contracts with the Prior Customers in an alleged amount in excess of $1.4 million. Integretel opposed the motion on various grounds, including: (a) Integretel did not hold any such reserves in a separate account; (b) the service contracts in place with the Prior Customers permitted Integretel to withhold certain monies owed to the Prior Customers as "reserves"; and (c) Integretel was not obligated to turn over those funds under the respective service contracts. Integretel also filed its own motions to modify the Florida Court's injunctive orders and to stay the contract claims pending arbitration. A hearing on these motions was held on April 12, 2007.

On September 14, 2007, the Florida Court entered the Omnibus Order. In the Omnibus Order, the Florida Court found that Integretel held reserves in the amount of $1,762,762.56 on behalf of the Prior Customers as of June 30, 2007 ("Commingled Funds"). The Florida Court stated that Integretel's assertion that the "reserves" were not held as segregated funds but rather were kept in a pooled account and tracked via an internal accounting entry was "a distinction without a difference, since the TRO captures funds 'held on behalf of, or for the benefit of, a Defendant.'"

1  Omnibus Order at 3. The Florida Court noted that "[a]n entity need

2  not be an agent, partner, joint venturer, trustee, fiduciary, or

3  legal representative to possess funds that one is holding 'on

4  behalf of' another person or entity..." <u>Id.</u> The Florida Court

5  also rejected Integretel's arguments that Integretel could retain

6  the "Commingled Funds" to fund Integretel's assertion of an

7  indemnity claim or liquidated damages for breach of contract

8  against the Prior Customers. <u>Id.</u> at 4.

9      Regarding Integretel's motions, the Florida Court denied

10  Integretel's request to stay the contract claims pending

11  arbitration of those claims pursuant to the service contract

12  arbitration clause, since the Florida Court concluded that Receiver

13  was not bound by the those clauses. The Florida Court stated in

14  particular:

15      The Receiver's claim is not a claim at law governed by
        pre-receivership contracts, however, but one governed by
16      this Court's jurisdiction over receivership property
        based on the TRO and Amended Preliminary Injunction. The
17      Receiver does not claim that the funds must be turned
        over according to, or by adopting, a contract signed
18      between Integretel and Access One/Network One. The
        Receiver is seeking to recover the reserve funds pursuant
19      to the Court's in rem jurisdiction over receivership
        property, as memorialized in the TRO and the Amended
20      Preliminary Injunction.

21  Omnibus Order at 4. In response to Integretel's argument that the

22  TRO and Preliminary Injunction would be invalid if those orders

23  permitted the Florida Court to determine Integretel's ownership

24  interest -- or lack thereof -- in the Commingled Funds without a

25  new, separate legal proceeding, the Florida Court stated: "[i]ssues

26  concerning entitlement to disputed receivership property, in fact,

27  are the types of issues typically determined via summary

28  proceedings in the federal court equity receivership context."

1   Id. at 5.   The Florida Court rejected Integretel's arguments that

2   Integretel was deprived of due process when the Florida Court

3   issued the TRO and Preliminary Injunction and also rejected

4   Integretel's various arguments that those orders are invalid.  The

5   Florida Court also denied Integretel's request to modify those

6   orders.  Finally the Florida Court:

> ORDERED AND ADJUDGED that the Receiver's Revised
> Motion for Order to Show Cause Why Integretel Should Not
> Be Held in Contempt of Court, filed October 16, 2006 **[DE
> 246]**, is GRANTED.  Integretel shall show cause in writing
> within 10 days of the date of this Order why it should
> not be held in contempt for failure to turn over the
> reserves.  In addition, Integretel shall provide a sworn
> statement identifying the amount of reserves as of the
> issuance of the TRO.  The Court further orders that these
> funds shall be placed in a segregated Receivership
> account.  It is further
>
> ORDERED AND ADJUDGED that Integretel's Motion to
> Modify Prior Injunctive Orders, filed October 30, 2006
> **[DE 294]**, is DENIED.  It is further
>
> ORDERED AND ADJUDGED that Integretel's Motion to
> Stay Contract Claims, filed December 29, 2006 **[DE 363]**,
> is DENIED. . . .

17  Omnibus Order at 10.  On September 16, 2007, promptly after

18  receiving the Omnibus Order, Integretel filed its bankruptcy

19  petition.

20      Debtor is one of seventeen defendants in the Florida Action.

21  Other than two pending motions regarding depositions, discovery is

22  complete in the Enforcement Action.[6]  Dispositive motions are

23  scheduled to be filed very soon -- by November 6, 2007, with

24  opposition to those motions to be filed by December 4, 2007, and

25  replies due by December 18, 2007.  Debtor asserts that Debtor will

---

[6] Integretel filed a motion to continue one deposition and another billing aggregator defendant filed a motion requesting ten additional depositions. The FTC opposed both motions and the Florida Court had not ruled on those motions as of October 15, 2007.

1  not be filing any dispositive motions, but anticipates having to

2  respond to dispositive motions filed by other parties.  The FTC has

3  stated that the FTC <u>will</u> seek summary judgment against Debtor.

4  Debtor asserts that a two- to four-week trial is set to commence in

5  the Florida Action on February 25, 2008.  The FTC predicts that the

6  FTC will prevail on the liability aspect in summary judgment and if

7  not, the FTC estimates that the trial will be no more than nine

8  days, and other defendants contend that the trial will take ten to

9  fifteen days at most.  The FTC does not contend that a preliminary

10  injunction against Debtor interferes with the FTC from proceeding

11  with the Enforcement Action against any of the other sixteen

12  defendants.

13      Debtor anticipates having to spend $821,600 in litigation

14  costs over the next six months related to depositions, discovery

15  motions, dispositive motions, other motions, pre-trial submissions

16  and trial.[7]  Debtor does not break out the estimated fees into the

17  various subcategories.  Debtor estimates that in addition to those

18  fees there will be an estimated $10,000 in fees for local counsel

19  and an estimated $50,000 to $75,000 in costs.[8]  In addition to

20  these estimated fees and costs, Debtor estimates that Debtor will

21  incur an additional $50,000 to $150,000 in fees related to

22  Receiver's request for turnover of the Commingled Funds.[9]

23

24

25

26  [7] Declaration of Neal Goldfarb in Support of Emergency Motion for Temporary Restraining
    Order and Preliminary Injunction filed on September 24, 2007 ("Goldfarb Dec.") at ¶¶ 5-6.

27  [8] Goldfarb Dec. at ¶ 7.

28  [9] Goldfarb Dec. at ¶ 8.

## C.  Events since Debtor Filed Its Bankruptcy Petition

As noted above, Debtor filed this chapter 11 bankruptcy case on September 16, 2007.  On September 17, 2007, Debtor filed a Notice of Bankruptcy in the Florida Action.  On September 18, 2007, this Court generated a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines setting, _inter alia_, a meeting of creditors for October 17, 2007 and a deadline for filing a proof of claim for non-governmental units of January 15, 2008 and for governmental units of March 14, 2008.  On September 20, 2007, the Florida Court issued an order stating that the Florida Action was stayed by the automatic stay.

On September 21, 2007, the FTC filed an emergency motion for clarification that the automatic stay did not apply to the Enforcement Action and the contempt proceedings.  On the same day, without granting Debtor an opportunity to respond to the FTC's emergency motion either in writing or orally, the Florida Court issued its Order Granting Motion for Clarification as to Scope of Stay ("Clarification Order").  In the Clarification Order, the Florida Court stated that in the Omnibus Order the Florida Court had "ruled that the reserve funds are the property of the receivership estate and ordered Integretel to pay the current reserve funds, amounting to $1,762,762.56, immediately to the Receiver."  Clarification Order at 1.

Furthermore, the Florida Court held that Bankruptcy Code section 362(b)(4)[10] did not stay the Enforcement Action.  The

---

[10] Unless otherwise noted, all statutory references are to Title 11, United States Code, as amended in 2005 ("Bankruptcy Code").

MEMORANDUM DECISION RE ORDER TO SHOW CAUSE, ETC.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Florida Court also stated with respect to the contempt proceedings brought by the Receiver:

> Nor is the contempt proceeding stayed. First, the automatic stay applies only to protect property of the bankruptcy estate or property of the debtor. See 11 U.S.C. § 362(a)(2). The Court has already ruled that the reserve funds are neither the property of the "bankruptcy estate" nor Integretel. Second, the 11 U.S.C. § 362(b)(4) exception also applies to civil contempt proceedings brought by a governmental unit in the exercise of its police or regulatory powers. See SEC v. Bilzerian, 131 F. Supp. 2d 10, 14 (D.D.C. 2001)(civil contempt proceeding falls within the exception; incarceration of debtor subsequent to failure to provide financial information as required by purgation provision in prior disgorgement order). Finally, the bankruptcy filing does not deprive this Court of its inherent power to enforce the integrity of its orders. "[C]ontempt orders to uphold the dignity of the court are excepted from the automatic stay." NRLB v. Sawulski, 158 B.R. 971, 975 (E.D. Mich. 1993).

Clarification Order at 4. Thus, even though the newly extant bankruptcy estate had no opportunity to respond to the FTC's emergency motion, the Florida Court granted the FTC's emergency motion. The Florida Court stated that the commencement of Debtor's bankruptcy case did not stay the contempt proceedings against Debtor or FTC's prosecution of the Enforcement Action and the Florida Court vacated the September 20, 2007 order staying proceedings against Debtor.

Also on September 21, 2007, this Court held a hearing on Debtor's emergency motion for interim use of cash collateral and Debtor's request for authority to maintain Debtor's pre-petition bank accounts. In its motion for interim use of cash collateral, Debtor requested court authority to use cash collateral pursuant to a stipulation with its secured creditor PaymentOne. Debtor asserted that PaymentOne was a secured creditor based on more than $6.4 million PaymentOne had loaned to Debtor between October 18,

2006 and the petition date (the "new value" provided by PaymentOne, in bankruptcy parlance). The motion for authority to maintain Debtor's pre-petition bank accounts was granted and the motion on the interim use of cash collateral was continued to September 26, 2007.

Prior to the September 26, 2007 hearing, seven objections were filed in opposition to Debtor's motion for interim use of cash collateral. Some of the oppositions raised questions regarding Debtor's viability and ability to operate successfully as a going concern. Prior to and at the hearing, Debtor obtained the consent of all parties to Debtor's use of cash collateral. In particular, Debtor and Receiver agreed to set up the Blocked Account whereby Debtor agreed to deposit $1,762,762.56 of its commingled funds into a blocked account and Debtor and Receiver agreed that the establishment of the Blocked Account did not in any way affect the merits of either parties' rights, claims or defenses with respect to the funds in the Blocked Account. Based in part on the consent of all parties, this Court granted Debtor interim use of cash collateral through October 15, 2007 and set a further hearing on the use of cash collateral for that day.

In papers relating to the September 26, 2007 hearing and at that hearing, Debtor informed this Court that negotiations were underway for a possible sale of PaymentOne to a third party. Debtor also requested the expedited appointment of the unsecured creditors' committee so that Debtor would have an entity with which Debtor could talk on a confidential basis with, and obtain the opinions regarding, possible reorganization scenarios, including the possible sale of PaymentOne. On October 1, 2007, the United

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   States Trustee filed a notice that a committee of seven unsecured

2   creditors of Debtor had been appointed. Two days later the

3   Committee selected the law firm of Pachulski Stang Ziehl & Jones

4   LLP as its counsel, subject to approval of this Court. Within a

5   week, Debtor and the Committee executed a confidentiality

6   agreement; Debtor provided the Committee with various documents and

7   information requested by the Committee; and the Committee began the

8   process of analyzing that information.

9       On October 10, 2007, the Committee and Debtor participated in

10  a five hour face-to-face meeting. Discussions at that meeting

11  included Debtor's financial information -- including projections,

12  claims against Debtor, Debtor's plan for post-petition pre-payment

13  to Debtor's pre-petition customers, Debtor's relationship with the

14  LECs, the status of the Florida Action, as well as plan of

15  reorganization issues. At that meeting, the Committee agreed to

16  consent to Debtor's continued use of cash collateral through

17  November 2. Debtor committed to negotiate with the Committee a

18  term sheet for a plan of reorganization contemplating a

19  continuation of Debtor's business operations with the goal of

20  allowing Debtor to exit bankruptcy as quickly as possible, while

21  maximizing the value to unsecured creditors. The Committee stated

22  its intention to use the time between October 10 and November 2 to

23  conduct further due diligence on Debtor's assets, liabilities and

24  financial affairs in an effort to be in a better position to

25  evaluate an exit strategy for Debtor from bankruptcy.

26      On October 15, 2007, this Court held a second hearing on

27  Debtor's interim use of cash collateral. In support of Debtor's

28  continued use of such cash collateral, Debtor submitted budgets

1   showing Debtor's actual and projected post-petition finances.

2   Debtor submitted one budget assuming that Debtor could use the

3   funds in the Blocked Account as well as the assumption that the

4   Enforcement Action and related proceedings were stayed.  Debtor

5   also submitted another budget without those assumptions.  Regarding

6   the projected $1 million in litigation expenses related to the

7   Florida Action, Debtor projected incurring $333,333 for the weeks

8   ending November 2, 2007, December 7, 2007, and January 4, 2008.

9   Debtor asserted at that hearing, and continues to assert, that

10  Debtor needs the funds in the Blocked Account and that without the

11  ability to use the funds in the Blocked Account, Debtor will not

12  have sufficient cash flow as of mid-December 2007.

13      Debtor's continued use of cash collateral again drew seven

14  objections, but the primary concern of the objecting creditors was

15  with respect to the alleged secured nature of their respective

16  claims, and not on Debtor's ability to stay in business.  In

17  addition, as noted above, Debtor's continued use of cash collateral

18  had the support of the Committee.  On October 16, 2007, this Court

19  granted Debtor's continued interim use of cash collateral.  A

20  hearing for final authority for Debtor to use cash collateral is

21  set for November 2, 2007.

22      Meanwhile, on October 1, 2007, Debtor requested additional

23  time -- until November 15, 2007 -- to file its schedules of assets

24  and liabilities ("Schedules") and statement of financial affairs

25  ("Statement").  In its application, Debtor noted the size and

26  complexity of Debtor's business operations, coupled with the

27  limited number of employees, who, in addition to their regular

28  duties, were capable of preparing the Statement and Schedules.  On

October 23, 2007, this Court granted Debtor's request. Debtor's Schedules and Statement are currently due on November 15, 2007.

On October 2, 2007, Debtor sought a temporary restraining order from this Court enjoining the Enforcement Action and seeking an order to show cause for the issuance of a preliminary injunction. At that hearing, this Court denied Debtor's request for a temporary restraining order of the Enforcement Action on the basis that for the period from October 2, 2007 through October 17, 2007, Debtor had not demonstrated that the threatened injury to Debtor outweighed the harms of a temporary restraining order against the FTC.[11] However, the Court found that there was cause to issue the OSC and the OSC was issued as to why a preliminary injunction should not issue.

On October 11, 2007, Debtor filed in the Eleventh Circuit a motion for an immediate interim stay of the Clarification Order in as far as that order held that the Florida Action -- other than the Enforcement Action -- was not automatically stayed. On October 17, 2007, the Eleventh Circuit temporarily granted Debtor's motion pending further order of the court ("Stay Order").

II.

APPLICABLE LAW

In the non-bankruptcy context, [the Ninth Circuit has] consistently required trial courts deciding preliminary injunction motions to balance the moving party's likelihood of success on the merits and the

---

[11] While Debtor originally sought a temporary restraining order against Receiver's continued enforcement of the Omnibus Order, the stipulation at the September 26 cash collateral hearing that resulted in the temporary establishment of the Blocked Account resolved that need to both parties' satisfaction.

relative hardship of the parties.  The moving party must show:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.
>
> As we have said many times regarding the two alternative formulations of the preliminary injunction test:  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  They are not separate tests but rather outer reaches of a single continuum.

Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005) (citations and internal quotation marks omitted).

Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations, Inc.), --- F.3d ---, 2007 WL 2555941 at *5 (9th Cir. Sept. 7, 2007) (emphasis in original).  The usual preliminary injunction standard applies to stays of proceedings under 11 U.S.C. § 105(a) ("Section 105").  Excel, 2007 WL 2555941 at *7.  In Excel, a reorganization case, the Ninth Circuit stated that in granting or denying an injunction under Section 105, "a bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful reorganization, the relative hardship of the parties, and any public interest concerns if relevant." Excel, 2007 WL 2555941 at *7.

**A. Reasonable Likelihood of a Successful Reorganization**

In a reorganization context, a debtor seeking a stay against a non-debtor must show a reasonable likelihood of a successful reorganization. <u>Excel</u>, 2007 WL 2555941 at *7. This is not a high burden, <u>id.</u> at *8, and a strong showing on the likelihood of a successful reorganization lowers the burden to show irreparable harm. <u>Id.</u> at *11.

The FTC argues that the Committee's unwillingness to consent to a final cash collateral order speaks volumes about Debtor's prospects -- or lack thereof -- of successfully reorganizing and that it remains to be seen whether this will be a "real" reorganization case. Citing general statistics, the FTC asserts it is more likely that Debtor's case will fall into the 90% or more of chapter 11 cases that are converted to liquidations or dismissed. The FTC argues that overall the record at this point demonstrates that Debtor's fate hangs precariously in the balance and a liquidation scenario is more, or at least as likely as, a successful reorganization and Debtor has not shown by a preponderance of the evidence a likelihood of success on the merits.[12]

Receiver asserts that Debtor has not shown a likelihood of success on the merits on the basis that Debtor's support by the Committee fails to address the numerous objections by creditors

---

[12] A bankruptcy case may have an excellent result for creditors, even in a liquidation context. For example, a successful sale of a debtor's business and subsequent liquidation of that debtor's assets in a chapter 11 or a chapter 7 may result in a substantial distribution to creditors.

claiming a security interest in Debtor's assets to Debtor's continued use of cash collateral. In addition, Debtor's strategy over the near-term presupposes Debtor will be able to use the Commingled Funds to fund Debtor's business operations, so Debtor cannot show a likelihood of success on the merits.

The Court disagrees with the FTC and Receiver. The Court finds that, at this juncture, Debtor has made a strong showing that Debtor has a reasonable likelihood of a successful reorganization. It is very early in Debtor's bankruptcy case -- Debtor's bankruptcy case is only six weeks old. In that short period of time, Debtor has obtained the confidence of its creditors that Debtor is a viable business and has a reasonable likelihood of reorganizing successfully. This is demonstrated in several ways. First, following strenuous initial objections, Debtor's creditors consented to Debtor's first interim use of cash collateral as soon as Debtor demonstrated its viability to the objecting creditors. Second, the LECs have for the most part continued to forward funds to Debtor. Third, in an effort to retain customers, Debtor is negotiating with its customers to provide a 50% pre-payment of the transferred accounts receivables at the time of transfer rather than having the customers wait 90 days, as those customers did pre-petition. Debtor has obtained the Committee's support of that plan. Fourth, the Committee is confident enough in Debtor's prospects of reorganization that the Committee supported Debtor's continued use of cash collateral for an additional three weeks to enable the Committee and Debtor to work together on the terms of a plan of reorganization.

1    In addition, Debtor and Debtor's 97%-owned subsidiary

2 PaymentOne are diligently exploring both a reorganization with

3 Debtor and a sale of PaymentOne's business to prospective

4 purchasers.   The proceeds of such a sale could help Debtor fund a

5 plan of reorganization.  Alternatively, Debtor is exploring the

6 possibility of a pot plan providing a pro-rata distribution to

7 unsecured creditors or a plan that would have Debtor continue its

8 operations and issue new stock in exchange for Debtor's unsecured

9 debt.

10    At this early stage of Debtor's bankruptcy case, Debtor's

11 reasonable likelihood of a successful reorganization is evident

12 from the support of Debtor's creditors and the Committee, Debtor's

13 clear pursuit of several viable avenues of possible reorganization,

14 Debtor's projections of positive cash flow for the next six months,

15 Debtor's retention of its customers and the continued success of

16 Debtor's business.  Thus, Debtor has met its burden of showing a

17 reasonable likelihood of a successful reorganization.[13]

18 **B.   The FTC's Enforcement Action**

19    The parties do not dispute for the purposes of the current

20 dispute that, under Bankruptcy Code section 362(b)(4), the

21 automatic stay does not stay the Enforcement Action.[14]  However, the

22

---

23     [13] Although the issue is not presented here, a court might appropriately enjoin an

enforcement action, like the FTC's, against a chapter 7 estate.  The chapter 7 trustee might well

24 convince the court not to allow the enforcement action to proceed until the trustee and the court

knew what assets and liabilities there were in the estate.  There would be no point, for example, in

25 allowing an enforcement action seeking a monetary judgment to proceed if the estate did not have

any money in it above the amount needed to pay administrative claims.  There also might be no

26 purpose in enjoining a chapter 7 debtor from engaging in certain business practices, if that debtor

was out of business.

27

28     [14] While the Clarification Order in which the District Court held that Bankruptcy Code

(continued...)

1   FTC argues that this Court does not have authority to stay that

2   litigation against Debtor under Section 105.  This Court disagrees.

3   Under _In re First Alliance Mortg. Co._, 264 B.R. 634 (C.D. Cal.

4   2001) ("_FAMCO_") and the myriad of authorities cited therein, this

5   Court has the legal authority to enjoin prosecution of governmental

6   actions against a debtor that falls within the regulatory and

7   police powers exception of Bankruptcy Code section 362(b)(4).

8   _FAMCO_, 264 B.R. at 652 n.18.

9        This Court may enjoin the prosecution of the Enforcement

10  Action under Section 105 if the Enforcement Action "threatens" the

11  assets of the bankruptcy estate.  _FAMCO_, 264 B.R. at 652.  Under

12  _FAMCO_, a Section 105 injunction could be appropriate against a

13  regulatory action in two types of situations.

14          First, a governmental action that seeks actual
            physical control over the assets of the debtor's estate
15          threatens the bankruptcy court's exclusive jurisdiction
            over the _res_ of the debtor's estate and therefore can be
16          enjoined. . . .

17          Second, a § 105 injunction of a regulatory or police
            powers action could be appropriate in other circumstances
18          that severely threaten the integrity of the bankruptcy
            process.  A few courts have enjoined regulatory or police
19          powers actions on the grounds that the costs of defending
            the actions at issue, both in terms of money spent on
20          lawyers' fees and time taken away from focusing on
            reorganization, were so high in comparison to the assets
21          of the estate that allowing the actions to continue
            constituted a "threat" to the estate.  _E.g._, _NLRB v._
22          _Superior Forwarding, Inc._, 762 F.2d 695, 698-99 (8th Cir.
            1985).  Because the bankruptcy court has the obligation
23          to protect and marshal the estate's assets, a severe
            enough threat to the assets of the estate constitutes a
24          threat to the bankruptcy process.

25

26   _____

27      [14](...continued)
     section 362(b)(4) did not apply to the Florida Action is on appeal, in that appeal, Debtor has not
28   challenged that Order insofar as the Clarification Order holds that the Enforcement Action is not
     automatically stayed.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 _Id._ at 655. In balancing the hardships between the parties, "[a]

2 bankruptcy court must 'identify the harms which a preliminary

3 injunction might cause to defendants and ... weigh these against

4 plaintiff's threatened injury.' Caribbean Marine Servs. Co. v.

5 Baldridge, 844 F.2d 668, 676 (9th Cir. 1988)(citation omitted)."

6 _Excel_, 2007 WL 2555941 at *9.

7 **1. Harms to FTC**

8 The FTC articulates that the FTC would be harmed by the

9 granting of a preliminary injunction because the FTC only seeks

10 what the FTC terms as "equitable" relief in the Enforcement Action

11 and this Court cannot grant all of the relief requested by the

12 FTC.[15] But there is no doubt that the FTC seeks to collect monies

13 from Debtor. Specifically, the FTC seeks monetary injunctive

14 relief in the form of disgorgement of monies received from

15 consumers and restitution to the consumers. In addition, the FTC

16 seeks a permanent injunction halting Debtor's allegedly unlawful

17 practices, rescission of contracts and a claims procedure to

18 provide restitution to the consumers who allegedly paid for

19 unauthorized charges on their phone bills.

20 The FTC also asserts that being enjoined from proceeding in

21 its chosen forum -- the Florida Court -- would harm the FTC in

22 other critical ways. The FTC quotes extensively from FAMCO which

23 states in this regard:

24 [T]he hardship to the governmental units of not being
allowed to proceed with their actions in their chosen
25 forums includes harms different in character from the

26 

---

27 [15] While this Court does not necessarily agree with the FTC that this Court could not grant
all equitable relief requested by the FTC in the Enforcement Action, due to the limited nature of the
28 preliminary injunction being granted at this time, there is no reason for this Court to address the
FTC's assertion.

harms normally considered on motions for injunctions under § 105. Being able to have a claim determined by the bankruptcy court is qualitatively different from proceeding with a lawsuit in home forums. As Congress recognized when it created the regulatory and police powers exception, the goals of public policy, punishment, and deterrence may sometimes conflict with the goals of maximizing an individual estate's assets and efficiently processing claims. It is the former goals, which are difficult if not impossible to measure in dollars and cents, that are impaired when a governmental unit loses the ability to enforce its laws in its own forum.

Considering deterrence in particular, the harm to the governmental units must be measured with a broader perspective in mind than these parties alone. The bankruptcy court and First Alliance are undoubtedly correct that there will be more money to distribute to borrowers in this case if the separate actions are not allowed to proceed. However, the governmental units are entitled to make the choice that, over time, similarly situated borrowers and consumers benefit more when companies do not violate the law in part because they know that bankruptcy will not provide a way out when their wrongs are discovered. In any given case, reasonable minds could disagree about the marginal costs and the marginal benefits of different approaches and which will maximize the wealth and happiness of the greatest number of people. The point is that it is the governmental units charged with enforcing consumer protection laws, governmental units that are responsive to the political will of the people, that should be the ones to make the choice, not the bankruptcy court.

FAMCO, 264 B.R. at 659.

The FTC asserts that the FTC's need for permanent injunctive relief is particularly acute here because the FTC needs permanent injunctive relief from the Florida Court barring Debtor's allegedly unlawful business practices. The FTC asserts that the FTC's pursuit of phone billing aggregators such as Debtor is a vital enforcement strategy that the FTC has pursued to curb the allegedly insidious and unlawful practice of placing unauthorized charges on consumers' phone bills. During the past nine years, the FTC has filed numerous actions against telephone billing aggregators and has obtained injunctive and monetary equitable relief. The FTC

Case: 07-05156    Doc# 41    Filed: 11/02/07    Entered: 11/02/07 13:23:40    Page 24 of
40

1  notes that this is not the first time that the FTC has sued Debtor

2  (the previous suit was settled) and some of Debtor's current

3  customers were recently prosecuted by state attorneys general for

4  placing unauthorized charges on consumers' phone bills and other

5  alleged deceptive trade practices.

6      **2.   Harms to Debtor**

7      Debtor has filed a chapter 11 bankruptcy petition. "The

8  purpose of title 11 protection is to allow an entity to

9  'restructure ... finances' and enter a plan of reorganization so

10  that it is able to 'continue to operate, provide its employees with

11  jobs, pay its creditors, and produce a fair return for its

12  stockholders.'" <u>CFTC v. NRG Energy, Inc.</u>, 457 F.3d 776, 779 (8th

13  Cir. 2006) (internal citation omitted). Said a different way,

14  "[t]he purpose of Chapter 11 reorganization is to assist

15  financially distressed business enterprises by providing them with

16  breathing space in which to return to a viable state." <u>In re</u>

17  <u>Little Creek Dev. Co.</u>, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting

18  <u>In re Winshall Settlor's Trust</u>, 785 F.2d 1136, 1137 (6th Cir.

19  1985)). Here "Debtor 'is a real company with real debt, real

20  creditors and a compelling need to reorganize in order to meet

21  these obligations' and is therefore, exactly the type of debtor for

22  which chapter 11 was enacted." <u>In re Dow Corning Corp.</u>, 244 B.R.

23  673, 677 (Bankr. E.D. Mich. 1999), <u>aff'd</u>, 255 B.R. 445 (E.D. Mich.

24  2000) (internal citation omitted). In determining irreparable

25  injury to Debtor, this Court must consider the impact of permitting

26  the Enforcement Action to proceed against Debtor at this point in

27  Debtor's bankruptcy case.

28

Debtor raises two main harms that would cause irreparable injury should this Court not preliminarily enjoin the Enforcement Action. First, Debtor anticipates having to spend over $900,000 in fees and costs over the next six months in the Enforcement Action. Debtor estimates it will incur $821,600 in litigation fees related to depositions, discovery motions, dispositive motions, other motions, pre-trial submissions and trial. In addition, Debtor estimates that there will be an estimated $10,000 in fees for local counsel and an estimated $50,000 to $70,000 in costs. Debtor's budgets show that Debtor will not be able to operate on an administratively solvent[16] basis if Debtor is forced to incur these substantial fees over the next six months.

The FTC argues that Debtor overestimates its costs to defend against the Enforcement Action. The FTC asserts that the declaration of Neal Goldfarb submitted by Debtor in support of its request lacks sufficient detail to support Debtor's proposed estimate. Moreover, the FTC argues that the estimate overstates the amount of estimated trial time and fails to consider that some of the issues in the Enforcement Action will be narrowed, if not eliminated, by summary judgment since the FTC's position is that the uncontested facts establish Debtor's liability.

The FTC further contends that the relevant comparison under FAMCO is not between Debtor's costs of defending itself against the

---

[16] In a chapter 11 bankruptcy case, all post-petition obligations have administrative priority status. This means that those claims are paid prior to most other claims in a bankruptcy estate, namely other priority claims and pre-petition unsecured claims. In addition, those claims must be paid in full on the effective date of a confirmed plan of reorganization. The effective date is usually 30 days after an order confirming a plan of reorganization is entered, but can be in as few as eleven days. To stay administratively solvent, a debtor would insure that debtor retains sufficient cash reserves on hand to pay all administrative claims in full on the effective date of a plan.

1  FTC in the Florida Court or not defending itself at all, but rather

2  between Debtor defending itself in the Florida Court and defending

3  itself in this Court.  According to the FTC, unless the Enforcement

4  Action is concluded as to Debtor, the same facts will have to be

5  litigated in this Court to establish a bankruptcy claim against

6  Debtor.[17]  Moreover, under the recently enacted changes to the

7  Bankruptcy Code, the FTC can pursue a non-dischargeability action

8  against Debtor for the FTC's monetary claim.  Finally, the FTC

9  alleges that it would pursue the <u>non-monetary</u> aspects of the

10  Enforcement Action after confirmation of Debtor's plan.  <u>NRG</u>

11  <u>Energy</u>, 457 F.3d at 780-81 (holding that a bankruptcy court has no

12  authority to enjoin a government agency from bringing a post-

13  confirmation enforcement action against a reorganized debtor for

14  injunctive relief against future law violations).[18]

15      The FTC does not address the second harm raised by Debtor: the

16  impact of the continuation of the Enforcement Action on Debtor's

17  reorganization efforts.  Debtor has relatively few employees and

18  Debtor's president, Mr. Dawson -- one of the founders of Debtor --

19  is and will continue to be very closely involved in Debtor's

20  defense in the Enforcement Action.  Mr. Dawson is also the main

21  contact for all of Debtor's reorganization efforts in addition to

22

23  [17] This argument is incorrect, or at least premature, because the Court is only enjoining the
    Enforcement Action for a few months and has not determined whether the Enforcement Action will
24  be adjudicated in the Florida Court or in this Court, if it ultimately needs to be adjudicated at all.  It
    might well settle in the bankruptcy context in connection with a plan of reorganization or otherwise.
25  In this connection, the desire of the post-petition Debtor and the FTC to resolve their disputes may
    be significantly greater than the situation before Debtor filed for bankruptcy.
26      Furthermore, even if the matter were tried in the bankruptcy court, this Court would
27  determine when the trial should take place.

28  [18] However, as noted, Debtor and the FTC may well settle those disputes in the context of
    Debtor's plan of reorganization or otherwise.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  his duties overseeing normal operational issues.  The bankruptcy

2  filing unsettled Debtor's customers and Debtor is working on a

3  proposed pre-payment plan whereby Debtor would pay 50% of the

4  receivables represented by post-petition billing submissions.

5  Because this is a new program, the program will be time-consuming

6  to implement and monitor.  In addition, Mr. Dawson needs to be

7  available to work with Debtor's reorganization counsel, the various

8  secured and unsecured creditors, the Committee and the United

9  States Trustee.

10      Further, the Committee supports Debtor's use of cash

11  collateral through November 2, 2007.  In exchange, Debtor has

12  committed to negotiate with the Committee a term sheet for a plan

13  of reorganization contemplating a continuation of Debtor's business

14  operations with the goal of allowing Debtor to exit bankruptcy as

15  quickly as possible.  Debtor is also monitoring the possible sale

16  of PaymentOne to a third party.

17      Finally, upon Debtor filing its chapter 11 bankruptcy

18  petition, Debtor became a "debtor-in-possession."  As a debtor-in-

19  possession, Debtor acts as a fiduciary to the bankruptcy estate and

20  owes a duty of care and loyalty to the bankruptcy estate's

21  creditors.  In re McConville, 110 F.3d 47, 50 (9th Cir. 1997).

22  Thus, Debtor thus is a new entity with different and additional

23  responsibilities, concerns and pressures than it had when Debtor

24  operated solely as Integretel.  Debtor, the Committee and Debtor's

25  other creditors need time to evaluate the merits and strengths of

26  the FTC's positions and decide whether the bankruptcy estate should

27  try to settle the Enforcement Action with the FTC.  Giving Debtor

28  and Debtor's creditors a few months to do that is critical at this

Case: 07-05156   Doc# 41   Filed: 11/02/07   Entered: 11/02/07 13:23:40   Page 28 of
40

1  juncture -- particularly in the context of negotiating a plan of

2  reorganization.

3  **3. Balancing of the Harms and the Public Interest**

4  Based on the unique facts of this case and in consideration

5  of the relative hardship of the parties and the public interest

6  concerns, the Court finds that continued prosecution of the

7  Enforcement Action severely threatens the integrity of the

8  bankruptcy process and Debtor's prospects for reorganization and a

9  preliminary injunction of the Enforcement Action against Debtor

10  through March 14, 2008 is warranted. On March 7, 2008 at

11  1:00 p.m., the Court will hold a further hearing on whether the

12  preliminary injunction of the Enforcement Action should be

13  continued beyond March 14, 2008. Either the FTC or Debtor may

14  request that the preliminary injunction be lifted before March 7,

15  2008 for good cause based on facts that are not currently before

16  this Court.

17  The FTC is concerned that this Court's granting of a

18  preliminary injunction against the Enforcement Action will set a

19  precedent that a defendant can escape prosecution for committing

20  deceptive and unfair trade practices by simply filing for

21  bankruptcy. The Court is keenly aware of the FTC's concern and

22  that is not what this Court intends. Rather, it is the unusual

23  convergence -- almost a perfect storm -- of the trial schedule in

24  the Enforcement Action and the critical first few months of a

25  viable chapter 11 bankruptcy case that warrant a limited

26  preliminary injunction at this time.

27  First, the next several months are a critical time for Debtor

28  in its effort to reorganize, and the immediate continuation of the

1   Enforcement Action seriously threatens Debtor's ability to

2   reorganize.  Debtor has only 37 employees to service its 58 pre-

3   petition customers and manage Debtor's relations with over 1400

4   LECs.  Moreover, Debtor's president, Mr. Dawson, is and will

5   continue to be closely involved in Debtor's defense in the

6   Enforcement Action.  If the Enforcement Action is not temporarily

7   stayed, Mr. Dawson would be required to divert his time and

8   attention from Debtor's reorganization between November 6 and

9   December 4, 2007 to assist Debtor's counsel in the Enforcement

10  Action in preparing an opposition to a motion for summary judgment

11  that the FTC has stated it will file against Debtor.  There may

12  also be eleven or more additional depositions in which Debtor will

13  need to participate if the Florida Court grants the pending motions

14  requesting additional discovery.  In addition, Mr. Dawson will be

15  required to fly to Florida during February 2008 to prepare for and

16  participate in the trial in the Enforcement Action scheduled to

17  commence on February 25, 2008.[19]  The diversion of Debtor's

18  management -- and Mr. Dawson in particular -- in defending the

19  Enforcement Action during the next few months seriously threatens

20  Debtor's reorganization.

21      Mr. Dawson is the main contact for all of Debtor's

22  reorganization efforts in addition to his duties overseeing normal

23  operational issues.  Debtor's reorganization efforts -- especially

24  at this early stage of Debtor's bankruptcy case -- are time-

25  consuming.  First, under the Bankruptcy Code, Debtor is required to

26

27  _____

28      [19] The trial situation could possibly change if FTC does file a summary judgment motion and
    it is granted in part or in full.  However, Debtor will still need to prepare for trial because Debtor
    cannot know in advance what the result will be of any as yet to be filed FTC motions.

obtain court approval for the use of its cash collateral post-petition. This is a marked difference from how Debtor operated pre-petition. Pre-petition Debtor could use any cash that came into Debtor's accounts subject only to claims of various creditors. Post-petition, however, Debtor must obtain the consent of all creditors who have an interest in that cash collateral or court approval for the use of that cash collateral. In this instance, the Court has approved Debtor's use of cash collateral on an interim basis at three-week intervals. Debtor has scheduled a final hearing for use of cash collateral for November 2, which depending on the status of its negotiations with its creditors, Debtor may or may not change to another interim request for use of cash collateral.

It is not unusual in a chapter 11 bankruptcy case for a debtor to seek multiple interim requests for use of cash collateral while a debtor negotiates with secured and unsecured creditors for final consent to a debtor's use of cash collateral. In the early stages of a bankruptcy case, creditors are getting up to speed regarding a debtor's business operations and the relative likelihood of recoveries for creditors pursuant to various reorganization proposals. During this time, creditors, debtors and the bankruptcy court strike a balance among the parties' interests and grant limited permission for a debtor to use post-petition cash collateral until the parties are comfortable with a debtor's plans to operate and can resolve a debtor's use of cash collateral on a final basis. The early, limited permission to use cash collateral is in part why a chapter 11 bankruptcy case is so time-intensive for a debtor, and indeed all parties in the early stages.

1  Second, the bankruptcy filing unsettled Debtor's customers and

2  Debtor is actively working on a proposed pre-payment plan whereby

3  Debtor would pay 50% of the receivables represented by post-

4  petition billing submissions.  This is a marked change from

5  Debtor's pre-petition operations where Debtor paid its customers

6  approximately 90 days after the billing transactions were submitted

7  to Debtor.  Because the pre-payment program is new, Mr. Dawson and

8  Debtor's other employees will have to spend a great deal of time

9  implementing and monitoring the new program.

10  Further, the Committee was appointed on October 1, 2007 and on

11  October 10, 2007, the Committee had a five hour face-to-face

12  meeting with Debtor.  At that meeting the Committee supported

13  Debtor's use of cash collateral through November 2, 2007 and in

14  exchange Debtor has committed to negotiate with the Committee a

15  term sheet for a plan of reorganization contemplating a

16  continuation of Debtor's business operations with the goal of

17  allowing Debtor to exit bankruptcy as quickly as possible.  Debtor

18  is also monitoring the possible sale of PaymentOne to a third

19  party.  Mr. Dawson is a, and probably _the_, critical participant in

20  those discussions and negotiations.

21  Finally, Debtor has complex business operations and over 1,200

22  creditors on its creditor matrix.  Due to the size and complexity

23  of Debtor's business operations, Debtor requires -- and has been

24  granted -- additional time to complete its Schedules and Statement

25  of Financial Affairs.  Those documents are currently due on

26  November 15, 2007.  The Schedules consist of seven separate

27  schedules that require Debtor to: (a)  list in detail all real and

28  personal property, the value of each piece or category of property,

1 and the security interest held against that property; (b) provide
2 separate lists of Debtor's creditors -- secured creditors, priority
3 unsecured creditors and unsecured creditors that includes an
4 address for each creditor, information regarding when the claim was
5 incurred and consideration for the claim, whether the claim is
6 contingent, unliquidated or disputed, and the amount of the claim;
7 (c) provide a detailed list of all executory contracts and
8 unexpired leases; and (d) provide a list of all entities that are
9 co-debtors with Debtor.  The Statement requires Debtor to answer
10 twenty-five questions in detail regarding Debtor's financial
11 affairs.  The questions require Debtor to detail, <u>inter alia</u>, all
12 payments or transfers Debtor made in the 90 days immediately
13 preceding the commencement of the case that aggregate more than
14 $5,475 to any creditor, and all payments or transfers Debtor made
15 within one year immediately preceding the commencement of the case
16 to any creditor that is an insider (all of the majority-owned
17 subsidiaries of Debtor are considered to be insiders).

18     Based on these projected activities, Debtor's management --
19 and Mr. Dawson in particular -- will spend the next few months
20 dealing with Debtor's customers and creditors, completing Debtor's
21 Schedules and Statement, negotiating with the Committee over the
22 terms for a plan of reorganization and, if successful, most of
23 November and early December will be spent negotiating a draft plan
24 of reorganization and overseeing the preparation of a proposed
25 disclosure statement.  Both of these documents will require
26 substantial amounts of time on the part of Mr. Dawson and Debtor's
27 other personnel.  The plan of reorganization is Debtor's contract
28 with its creditors as to how Debtor intends to restructure itself

using the Bankruptcy Code. In addition, the proposed disclosure statement is similar to a prospectus and will require, inter alia, a description of Debtor's background, the events that caused Debtor to file its bankruptcy case, what has changed such that Debtor will be able to complete its proposed plan of reorganization, a description of the proposed plan, and financial projections in support of the plan if Debtor proposes to present a plan that permits Debtor to operate as a going concern. Debtor must submit its proposed disclosure statement to this Court for approval. 11 U.S.C. § 1125(b). Such activities will consume a huge portion of the available time of Debtor's management over the next few months.

However, should Debtor be required to proceed to trial in the Enforcement Action at the end of February 2008, Mr. Dawson and other of Debtor's personnel will be required to travel to Florida and spend many days -- if not weeks in the case of Mr. Dawson -- preparing for and participating in the trial in the Enforcement Action. This activity will take place at a critical juncture of Debtor's bankruptcy case where Debtor should instead be seeking confirmation of a plan of reorganization. Debtor is committed to proposing a plan of reorganization on an expeditious basis. Under the notice requirements of the Bankruptcy Code and Rules, it is highly likely that Debtor will seek approval of a disclosure statement during January 2008, and could set a confirmation hearing on a proposed plan of reorganization during February or March 2008.

Confirmation of a chapter 11 plan requires an enormous amount of work for both a debtor and its counsel. In addition to resolving and addressing any objections by any parties to approval of a disclosure statement and confirmation of a plan, this Court

1   has an independent duty to ensure that a disclosure statement

2   contains adequate information, In re Main Street AC, Inc., 234 B.R.

3   771, 774 (Bankr. N.D. Cal. 1999), and an affirmative duty to ensure

4   that a plan satisfies all sixteen requirements of Bankruptcy Code

5   section 1129 for confirmation.  In re Ambanc La Mesa Ltd. P'ship.,

6   115 F.3d 650, 653 (9th Cir. 1997).  Just one of the requirements is

7   that this Court must determine that confirmation of Debtor's plan

8   will not likely be followed by the liquidation or further financial

9   reorganization.  11. U.S.C. § 1129(a)(11).  Mr. Dawson will almost

10  certainly be required to testify before this Court as to Debtor's

11  plan and the financial projections on which it is based, as well as

12  other evidence this Court requires to confirm any proposed plan

13  submitted for confirmation by Debtor.

14      In addition to the impact of the Enforcement Action on

15  Debtor's president and other personnel, it would be highly

16  injurious to Debtor and Debtor's prospects for reorganization if

17  Debtor had to spend the bulk of the estimated $1 million in legal

18  fees and costs associated with the Enforcement Action during this

19  same critical period.  Such an outlay of funds at a critical time

20  of confirmation would seriously impair, if not strike a death

21  knell, to Debtor's prospects for a reorganization.  Debtor is

22  required under the Bankruptcy Code to pay all administrative claims

23  as of the effective date of a confirmed plan.  11 U.S.C.

24  § 1129(a)(9)(A).  Debtor may well not have sufficient funds to both

25  pay the litigation costs of defending the Enforcement Action and

26  pay administrative claims on the effective date of a confirmed

27  plan.

28

The FTC likely holds only a pre-petition unsecured claim against Debtor in the Enforcement Action. Any monetary claims FTC asserts against Debtor arise only from Debtor's alleged pre-petition placing of unauthorized collect call charges onto consumers' telephone bills. There is no showing that at this point there is any reason for Debtor to spend $1 million litigating an unsecured claim in the next five months. First, at this juncture it is unclear what unsecured creditors will receive in Debtor's reorganization and it is unknown if spending $1 million to defend against the FTC's claims makes sense, especially in this case where secured and other unsecured creditors desperately need for all resources to be devoted to Debtor's reorganization efforts. Second, over the next five months Debtor may negotiate a resolution of the FTC's claims without the need for litigation. This Court is not determining at this juncture where the FTC's claims will be liquidated. Rather, this Court is merely delaying briefly the Enforcement Action against Debtor only.[20] It is this Court's experience that in chapter 11 cases such as Debtor's, a debtor typically negotiates with the various creditors to reach a consensus as to the structure of a plan of reorganization. It is generally less expensive and easier if a debtor can negotiate a plan of reorganization than if a debtor has to confirm a plan of reorganization over the objections of numerous creditors. At the early stages of Debtor's case and under the facts of this case, a preliminary injunction of limited duration is warranted.

---

[20]This Court's decision stays the Enforcement Action against Debtor for a few months. This decision does not determine whether (1) the FTC may recommence the Enforcement Action in the Florida Court after those few months, or (2) whether the FTC should be required to pursue Debtor by filing a claim with, and litigating that claim in, the bankruptcy court.

By limiting the duration of the preliminary injunction and requiring Debtor to provide further updated evidence in mid-February 2008 to support the continued injunction of the Enforcement Action, this Court eliminates or at least reduces substantially the alleged harms of the FTC. The FTC cites three harms from a possible injunction of the Enforcement Action: (1) the inability of the FTC to obtain the non-monetary equitable relief it seeks against Debtor; (2) the inability of the FTC to pursue the claims in the Enforcement Action against Debtor in the Florida Court; and (3) the public interest in permitting the FTC to pursue a vital enforcement strategy to curb the unlawful practice of placing unauthorized charges on consumers' phone bills. However, this Court has not eliminated, and is not eliminating, the possibility that at a later date this Court would permit the FTC to prosecute the Enforcement Action in the Florida Court, including the ability of the FTC to obtain the non-monetary equitable relief it seeks against Debtor. The FTC itself notes that it will seek such relief against Debtor post-confirmation. This Court is merely delaying for a few months the FTC's prosecution of the Enforcement Action against Debtor. No decision has yet been made as to where the FTC's claims will be litigated if indeed those claims need to be litigated at all.

Granting a preliminary injunction of limited duration also renders premature the FTC's argument that this Court must consider Debtor's costs of Debtor defending itself in the Florida Court and defending itself in this Court rather than Debtor's costs of defending itself against the FTC in the Florida Court or not defending itself at all. First, Debtor will not likely be

prosecuting an objection to the FTC's claim in the next few months.
Indeed, March 14, 2008 is the claims bar date for governmental
units in Debtor's bankruptcy case. Thus, for this limited duration
preliminary injunction, Debtor almost certainly will not incur any
costs defending itself in this Court against the FTC's claims.[21]

## C. Contempt Proceedings and Turnover Action

### 1. Debtor's Ability to Sue the Receiver

Receiver argues that this Court lacks subject matter
jurisdiction over this adversary proceeding as to Receiver because
Debtor has not obtained permission from the Florida Court to bring
this action -- or any action -- against Receiver. Receiver asserts
that for over 100 years, legal authority holds that a litigant must
obtain permission from the court appointing a receiver before
bringing an action against that receiver. Carter v. Rodgers, 220
F.3d 1249, 1252 (11th Cir. 2000) (holding that under Barton v.
Barbour, 104 U.S. 126 (1881), a debtor must obtain leave from the
bankruptcy court before the debtor can initiate an action in
district court against a bankruptcy-court appointed trustee for
breach of fiduciary duties); In re Crown Vantage, Inc., 421 F.3d
963, 970 (9th Cir. 2005) (a bankruptcy-court appointed trustee of a
liquidating trust cannot be sued in a foreign jurisdiction for
violating a settlement agreement without the permission of the
court appointing the trustee).

Debtor asserts that the Barton doctrine applies only if Debtor
were suing Receiver for dereliction of duties, which Debtor is not
doing in this adversary proceeding. Moreover, Debtor argues that
Crown Vantage stands for the proposition that Debtor does not need

---

[21] See footnote 17, supra.

1   leave from the Florida Court to sue Receiver in this instance

2   because this Court has exclusive in rem jurisdiction to determine

3   the property of Debtor's bankruptcy estate and the injunctive

4   relief requested by Debtor is a stay specifically designed to

5   protect the assets of the bankruptcy estate, so the Barton doctrine

6   is not invoked.

7       This Court agrees with Debtor that once Debtor filed its

8   bankruptcy petition on September 16, 2007, this Court obtained

9   exclusive in rem jurisdiction over the property in Debtor's

10  bankruptcy estate, and particularly over any legal and equitable

11  interest Debtor held in the Commingled Funds as of the commencement

12  of the case.  While none of the parties or this Court have found

13  any cases directly on point, the Court finds Gilchrist v. General

14  Elec. Capital Corp., 262 F.3d 295 (4th Cir. 2001), particularly

15  instructive.

16      In Gilchrist, Spartan International, Incorporated and its

17  subsidiaries (collectively, "Spartan") closed their doors for

18  business.  Spartan's major creditor ("GE") commenced a state law

19  debt-collection action invoking the diversity jurisdiction of the

20  district court of South Carolina ("South Carolina Court").  To

21  facilitate the foreclosure of the creditor's lien, the South

22  Carolina Court appointed a federal receiver for all of Spartan's

23  assets ("Receiver Order").  The Receiver Order enjoined all persons

24  from commencing or prosecuting any action, suit or proceeding that

25  affected the receivership estate or Spartan.  Gilchrist, 262 F.3d

26  at 297-98.

27      One week later and with actual notice of the Receiver Order,

28  50 creditors ("Georgia Creditors") filed an involuntary bankruptcy

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE

1   petition in the bankruptcy court in the Southern District of
2   Georgia ("Georgia Court") and a request for the appointment of an
3   interim bankruptcy trustee.  GE objected to the appointment of an
4   interim bankruptcy trustee and filed a motion to dismiss the
5   involuntary bankruptcy petition or transfer venue to the district
6   of South Carolina.  The receiver filed a similar motion.  Following
7   a hearing, the Georgia Court overruled the objections, denied the
8   motions and appointed an interim bankruptcy trustee.  Gilchrist,
9   262 F.3d at 298.

10      While that hearing was in progress, the receiver obtained a
11  temporary restraining order from the South Carolina Court enjoining
12  38 of the Georgia Creditors from undertaking any action in
13  furtherance of the involuntary bankruptcy petition.  Four days
14  later the South Carolina Court found the Georgia Creditors in
15  contempt of the Receiver Order and allowed the Georgia Creditors to
16  purge their contempt by withdrawing the bankruptcy petition.  The
17  interim bankruptcy trustee argued that the automatic stay precluded
18  the South Carolina Court's actions, but the South Carolina Court
19  refused to recognize the automatic stay of its proceedings.  The
20  South Carolina Court asserted that it had jurisdiction to determine
21  the scope of the automatic stay, and it had the authority to issue
22  an injunction to prevent the collateral attack of that court's
23  Receiver Order appointing the receiver.  In an effort to purge
24  their contempt, the Georgia Creditors subsequently filed a petition
25  in the Georgia Court to withdraw the involuntary petition, which
26  the Georgia Court denied.  The Georgia Court stayed further
27  proceedings pending a review of the South Carolina Court's orders
28  by the Fourth Circuit.  Gilchrist, 262 F.3d at 298-99.